IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JHA-KAI P. & ZAYNE P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JHA-KAI P. & ZAYNE P., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHAQUIA P., APPELLANT.

Filed May 20, 2023.    No. A-22-695.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Justin D. Eichmann, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Shaquia P. appeals from the separate juvenile court of Douglas County, which terminated Shaquia's parental rights with respect to her two minor children, Jha-Kai P. and Zayne P. Shaquia challenges the sufficiency of the evidence in support of the juvenile court's findings. For the reasons that follow, we affirm.

## BACKGROUND

In April 2017, the State filed a juvenile petition alleging that Jha-Kai was without proper parental care and at risk of harm by reason of the fault or habits of Shaquia, to wit: Law enforcement conducted a welfare check at the family home and discovered injuries to Jha-Kai which "did not appear consistent" with Shaquia's provided explanation. Shaquia was arrested

- 1 -

pursuant to an active warrant for past child neglect, and Jha-Kai was removed from the home and placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). Shaquia initially denied the allegations in the juvenile petition, and Jha-Kai remained in DHHS custody subject to Shaquia's reasonable rights of visitation. In that regard, Shaquia was "invited to" participate in supervised visitation with Jha-Kai and engage with various support services.

In July 2017, Shaquia amended her plea and admitted to the allegations above, and the court adjudicated Jha-Kai as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2022). The court further ordered that Shaquia "shall" participate in individual therapy and engage with further support services. In December 2017, Shaquia moved for unsupervised visitation with Jha-Kai, which motion was granted without objection. However, three days later, following a review and permanency planning hearing, the court found "[t]hat there cannot be a transition to unsupervised visitation and/or placement with [Shaquia] by agreement of all parties as it is contrary to the law." The court added that Shaquia must complete parent training and learn appropriate parental responses prior to any unsupervised visitation.

In April 2018, following a review and permanency planning hearing, the court ordered that Jha-Kai remain in DHHS custody, but the court noted that Shaquia "is making therapeutic progress." Thus, the court ordered that Jha-Kai "will begin to transition back to [Shaquia's] home" beginning with unsupervised visitation and gradually increasing to overnight and extended visitation. This transition appeared to be going well, as the court ordered in July 2018, that "[Jha-Kai] shall be transitioned back to [Shaquia's] home over the next thirty days." Jha-Kai returned to Shaquia's home for placement sometime between July and September 2018, but remained in temporary DHHS custody.

Jha-Kai remained placed in Shaquia's home as of a December 2018 review and permanency planning hearing, however, the court expressed concerns with the length of time that the case had been open and noted recent concerning events including Shaquia quitting her job and falling behind on rent and utilities. Among other things, the court ordered that Shaquia have no contact with one "Mr. Davis." The record reflects that the court was referring to "Terrell Davis" who was brought to the attention of DHHS in December 2018, when an anonymous reporter expressed concern that Davis was living in Shaquia's home and had a history of violent crimes. It was determined that Davis promptly moved out of the home, and Shaquia reported "at the end of December 2018" that she was no longer in a relationship with Davis.

Following a March 2019 review and permanency planning hearing, the court observed that Shaquia continued to rely heavily on caseworkers and service providers to access resources, and ordered that Shaquia demonstrate at least 90 days of stability prior to case closure. Two days later, DHHS received a report of Shaquia "'snatching Jha-Kai up' and twisting his ear for having a behavior and throwing himself on the floor." The reporter further observed that Jha-Kai was "dirty and 'smelled of urine.'" Shortly thereafter, on March 26, 2019, Jha-Kai was once again removed from Shaquia's home after law enforcement responded to the home "regarding a male screaming, making threats, and breaking property." Upon arrival, law enforcement identified the male suspect as Loyal Brown, and Shaquia reported that Brown "was verbally aggressive, was making threats such as he was going to 'shoot her in the face,' and was throwing various items through windows."

Shaquia further reported that she and Brown "had been in a relationship for 3 years and were cohabitants."

In an affidavit for removal, a DHHS caseworker attested that Shaquia "has not been forthcoming or honest" regarding the continued concerns of DHHS and has "demonstrated that [she] is unable or unwilling to provide for Jha-Kai's immediate needs for supervision." Altogether, the court found that Jha-Kai must be removed from Shaquia's home "due to exigent circumstances, including but not limited to the ongoing domestic violence, [and] inappropriate physical discipline by [Shaquia]." Jha-Kai remained placed outside of Shaquia's home for the remainder of the case.

In July 2019, Shaquia was ordered to, inter alia, demonstrate an ability to maintain a stable living environment for Jha-Kai and provide for his basic needs while participating in several services intended to address the ongoing safety concerns. In June 2020, Shaquia gave birth to a second child, Zayne. DHHS later reported that following the birth of Zayne, "Shaquia stepped it up and found housing for her and [Zayne]," first through a nonprofit program that provides temporary housing support and then at a homeless shelter. In September 2020, the juvenile court entered an order granting Shaquia's motion for supervised visitation to occur at the homeless shelter.

In a November 2020 court report, DHHS caseworker, Madeline Coble, reported concerns that Shaquia "has not taken much action and is neglectful of taking care of her financial needs." At that time, Shaquia owed "about $1000" in past due utility bills and "does not have up to date tags on her vehicle, and is also driving without any car insurance." Coble reported that she offered Shaquia resources to begin addressing her financial difficulties but that Shaquia "has not followed through with doing so in the last several months." Coble noted that there was a period of time where Shaquia was living rent free and making good money at a previous job, yet "she did not save any money or work on paying off past due bills." Shaquia was reportedly preparing to move into a new apartment, however, Coble noted a "major concern" regarding Shaquia's ability to provide a stable living environment going forward.

In November 2020, Zayne was removed from Shaquia's care and custody when Shaquia left Zayne with a third party who then called the police and reported that Zayne had been left without anyone to care for him. The State promptly filed a juvenile petition alleging that Zayne lacked proper parental care and was at risk of harm by reason of the fault or habits of Shaquia, to wit: Shaquia was incarcerated, Shaquia had failed to reunify with Jha-Kai despite "numerous and ongoing services," Shaquia was unavailable to provide adequate housing, and Shaquia was unavailable to provide care, support, and supervision. On December 9, the court entered an adjudication order noting that Shaquia admitted to the allegations that she was unavailable to provide care, support, and supervision and that Zayne was at risk of harm. Thus, the court found Zayne to be a child within the meaning of § 43-247(3)(a), and ordered that Zayne remain in DHHS custody pending further proceedings.

In December 2020, the State filed an information charging Shaquia with one count of being an accessory to a felony. Shaquia remained incarcerated until September 2021, when she was sentenced to one year of probation after pleading no contest to that charge. During this time, Jha-Kai and Zayne were placed together in the same foster home, and they were reportedly happy and healthy in that environment. DHHS caseworker, Shekita Lewis, reported that Shaquia

maintained telephonic visitation with her children while she was incarcerated, and those visits seemed to be going well.

In a January 2022 court report, Lewis reported that Shaquia recommenced supervised visitation three times per week after she was released from jail in September 2021. Lewis further reported that visits "are reported to go very well when they occur." Lewis added that "Shaquia provides for the needs of the children and they appear bonded to Shaquia." Lewis further reported that Shaquia moved into a new apartment in December 2021, and arranged to participate in a program which paid 100 percent of her rent for 3 months and 60 percent of her rent for 9 months thereafter. Lewis noted that the program will give Shaquia "an opportunity to take care of all of the barriers that would prevent her from getting a place to live in her name." Following a review and permanency planning hearing in February 2022, Shaquia was ordered to undergo an updated psychological evaluation and parenting assessment, which was completed in March.

In March 2022, the State filed a third motion for termination of Shaquia's parental rights with respect to Jha-Kai and Zayne. The State alleged statutory bases for termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2022), and that termination was in the best interests of the children. In a June 2022 court report, Lewis reported that Shaquia participated in only 7 of 15 visits scheduled in April and only 8 of 14 visits scheduled in May. Lewis further reported that visits were reported to go "ok" but that Shaquia would "be on her phone quite a bit during her visits." Lewis also noted that Shaquia "has not maintained contact [with her] . . . since April 2022," and that Shaquia was set to lose her apartment in July "due to her abandoning her apartment and not maintaining the utilities." The hearing on the third motion for termination of parental rights was scheduled for August 2022.

The State's first witness was Dr. Theodore DeLaet, who was the psychologist who conducted Shaquia's updated psychological evaluation and parenting assessment. DeLaet evaluated Shaquia to be at a "moderate risk" to engage in future child maltreatment and rendered a number of diagnoses, including alcohol use disorder, posttraumatic stress disorder, and attention-deficit/hyperactivity disorder. DeLaet opined that these diagnoses would negatively impact Shaquia's ability to parent her children if left untreated. DeLaet ultimately recommended that Shaquia participate in therapy and referred her for medication management.

Following DeLaet, the State called visitation worker, Miranda Meyers, who testified that she had been supervising visits between Shaquia and the children since November 2021. Meyers testified that Shaquia initially participated fully in supervised visitation, missing only one visit in November 2021. However, Meyers indicated that Shaquia became less consistent in the months thereafter. For example, Meyers testified that at some point Shaquia's visits were reduced from three times a week to once a week due to a lack of consistency. Meyers further testified that Shaquia seemed to spend a lot of time on her cell phone and did not engage with the children much beyond periodic discipline. With respect to discipline, Meyers recalled needing to redirect Shaquia following at least one instance of inappropriate discipline during a visit. Meyers further testified that Shaquia struggled to provide food for the children during visits, which would result in visits being shortened from two hours to one.

The children's foster placement, Melissa Williams, testified to various behavioral issues with Jha-Kai in particular. For example, Williams testified that Jha-Kai struggled to control his anger and could be aggressive. Williams also testified that Jha-Kai would wet the bed at times and

have bowel movement accidents at school. Williams added that Shaquia had never attended either of the children's medical appointments or extracurricular activities and corroborated the reports that Shaquia struggled to consistently participate in visitation since being released from jail in September 2021.

The State's final two witnesses were DHHS caseworkers, Lewis and Coble. In addition to reiterating information from her court reports discussed above, Lewis testified that Shaquia refused to follow up on DeLaet's recommendations for therapy and medication management. In fact, Lewis testified that Shaquia had simply refused to participate in therapy since being initially ordered to do so in 2017. Moreover, Shaquia's probation officer testified that she was sanctioned and "ruled up to a higher level of supervision" for repeatedly failing to report for drug testing and "for her lack of follow-through on any of her court orders."

Lewis also testified that Shaquia's employment status had become increasingly "sporadic" since February or March 2022. While Shaquia would report that she was working at various jobs, she failed to provide verification and Lewis' attempts to verify would often reveal inconsistencies in Shaquia's reports. Overall, Lewis opined that Shaquia had not made any progress toward reunifying with her children and that termination of her parental rights was in the best interests of the children.

Coble generally reiterated many of the concerns already discussed, and she likewise opined that termination of Shaquia's parental rights was in the best interests of the children. Specifically, Coble testified that she felt Shaquia "had been given an ample amount of time to work through any barriers and to progress and was given the tools and services and the resources needed to progress and that was not happening." The State rested its case, after which Shaquia offered a single letter to the court written by her sister, which was received into evidence, and then Shaquia rested her case without any additional evidence.

In September 2022, the juvenile court entered an order terminating Shaquia's parental rights with respect to Jha-Kai and Zayne. The court found that the State had proved statutory bases for termination under § 43-292(2), (6), and (7). The court noted that the case had been open for over five years, and that Shaquia had failed to make progress in a number of areas from visitation and parenting skills to engagement with rehabilitative services and employment. Altogether, the court found that Shaquia was not a fit parent and that termination of her parental rights was in the best interests of the children.

## ASSIGNMENTS OF ERROR

Shaquia assigns that the juvenile court erred in (1) finding that Shaquia substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection, (2) finding that reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the determination, and (3) finding that termination of Shaquia's parental rights was in the best interests of her children.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

*Statutory Basis.*

There is no dispute that a statutory basis for termination of Shaquia's parental rights exists under § 43-292(7). Under § 43-292(7), the court may terminate parental rights when the child has been in an out-of-home placement for 15 or more months of the most recent 22 months. In this case, Jha-Kai had been in an out-of-home placement since March 2019, and Zayne had been in an out-of-home placement since November 2020. Thus, there is no question that the requirements of § 43-292(7) were met as of the termination hearing in August 2022, and we need not inquire as to the other alleged statutory bases. See *In re Interest of Leyton C. & Landyn C., supra* (any one of bases for termination of parental rights codified by § 43-292 can serve as basis for termination when coupled with evidence that termination is in best interests of child).

*Best Interests.*

While Shaquia assigns three distinct alleged errors, her brief on appeal contains only a single argument section, wherein she argues that the State failed to prove that termination was in the best interests of the children. In fact, aside from the following paragraph of argument, Shaquia's brief does little more than quote language from the juvenile court's review and permanency planning orders and assert conclusory propositions of law:

> No witnesses provided first-hand testimony regarding [Shaquia's] ability to parent the Minor Children appropriately. Other than the visitation worker, who testified that [Shaquia] was appropriate with the Children . . . , no single witness could testify to the bond between [Shaquia] and the Minor Children or provide an account of their interactions. The lack of testimony regarding any negative interaction speaks to the inability of the Court to determine whether [Shaquia] could provide necessary care and protection to the Minor Children.

Brief for appellant at 23. On those grounds, Shaquia asserts that the State failed to prove that termination of her parental rights was in the best interests of the children. We disagree.

Despite over five years of court involvement, testimony from numerous witnesses, and a number of detailed documentary exhibits, Shaquia relies almost exclusively on roughly 10 pages of testimony from Meyers, who had been supervising weekly visits for less than a year. Moreover, Shaquia's characterization of that limited testimony is exceedingly difficult to reconcile with the record.

The record in this case is replete with evidence documenting the safety concerns affecting this family and Shaquia's apparent inability, despite ample opportunity, to make progress toward

reunification with the children. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021) (children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity). Accordingly, we agree with the juvenile court that the State met its burden to prove both a statutory basis for termination of Shaquia's parental rights and that termination of Shaquia's parental rights was in the best interests of the children.

CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Shaquia's parental rights with respect to Jha-Kai and Zayne.

AFFIRMED.